**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

JOHN T. YOERGER,

Plaintiff,

vs.

DATADOG, INC.,

Defendant.

Case No.:

**COMPLAINT**

JURY TRIAL DEMANDED

Plaintiff John T. Yoerger ("Plaintiff") by and through his attorneys, Late Knight Legal PLLC d/b/a Knight Legal PLLC and Mesidor PLLC, as and for his Complaint and for claims against Defendant Datadog, Inc. ("Datadog") allege and aver as follows:

## PRELIMINARY STATEMENT

1. In five weeks, Datadog took John Yoerger from praised high performer to terminated employee. What changed in those five weeks was not his performance, rather Datadog learned he knew his rights under the laws and used them unabashedly.

2. Plaintiff joined Datadog in June 2025 and delivered immediately. His manager told him nearly every week how glad she was to have hired him. One day before his termination, he announced to Datadog's entire sales organization that his program was on track, for the first time, to hit an ambitious 40% year-over-year growth target. One week after his termination, he had been scheduled to discuss a promotion.

3. But on September 19, 2025, a Human Resources ("HR") meeting ostensibly about travel bookings turned into something else. HR questioned Plaintiff about his disability accommodation, about his pending disability-discrimination lawsuit against a former employer,

and about his encouragement of colleagues to request accommodations they were legally entitled to seek. None of that had anything to do with travel. All of it was protected activity.

4. Seventeen days later, Datadog issued Plaintiff a "Final Written Warning" (his first warning of any kind) that expressly cited his statements to colleagues about accommodations. His own manager was given no advance notice, no discretion, and no opportunity to provide context; she disagreed with the discipline and, in nearly ten years at the company, had never seen an employee treated this way. When Plaintiff then objected in writing that Datadog was degrading his granted accommodation and cited the ADA, Datadog opened a second investigation. Eighteen days after that, it fired him — citing unspecified “continued inappropriate behavior” it has never identified, in writing or otherwise.

5. The New York City Human Rights Law forbids exactly this. It must be “construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof,” N.Y.C. Admin. Code § 8-130(a), and it prohibits not only discrimination and retaliation but any conduct that would deter a reasonable person from exercising protected rights. Datadog's conduct—interrogation about protected activity, a retaliatory warning, a degraded accommodation, and a pretextual termination—violated the NYCHRL, the New York State Human Rights Law, and the Americans with Disabilities Act. Plaintiff brings this action to hold Datadog accountable, vindicate the rule of law, and to make himself whole.

## PARTIES

6. Plaintiff John T. Yoerger is an individual residing in New York City.

7. Defendant Datadog, Inc. is a U.S. corporation incorporated in Delaware and whose principal place of business is New York City.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff asserts federal law claims under the ADA.

9. Further, this Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367, as they arise out of the same set of facts and circumstances as the federal claims and form part of the same case or controversy.

10. Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims alleged herein occurred in this District.

## ADMINISTRATIVE PROCEDURES

11. On January 29, 2026, Plaintiff timely filed a complaint, upon which this Complaint is based, with the United States Equal Employment Opportunity Commission ("EEOC").

12. Datadog did not bother to respond to the charge of discrimination with a position statement as requested by the EEOC.

13. On June 1, 2026, the EEOC issued a Notice of Right to Sue to Plaintiff, with respect to the instant charges of discrimination. A copy of the Notice is annexed to this Complaint.

14. This action is being commenced within 90 days of receipt of the Notice of Right to Sue.

15. Pursuant to NYCHRL § 8-502, Plaintiff will serve a copy of this Complaint upon the New York City Commission on Human Rights and the New York City Law Department, Office of the Corporate Counsel, thereby satisfying the notice requirements of that section.

# FACTUAL ALLEGATIONS

## I. Plaintiff's Employment Generally

16. Plaintiff began employment at Datadog on June 23, 2025, as a Principal Field Marketing Manager.

17. As required by Datadog as a stipulation of employment, Plaintiff relocated from Washington, D.C. to New York City on August 1, 2025.

18. Plaintiff was responsible for, *inter alia*, developing the strategy for, driving innovation and scaling mechanisms to deliver, and executing on the event meetings program, which influences more than $250M in sales pipeline per year.

19. Through the end of his employment, Plaintiff's job performance was regularly praised. Plaintiff's direct manager, Kimberly Buhay, Director of Field Marketing, said on a near weekly basis that she was "so glad [she] hired [Plaintiff]."

20. Likewise, many cross-functional partners and leaders praised Plaintiff for the exceptional results and impact Plaintiff was able to deliver in such a short time.

21. Among Director-level leaders at Datadog across multiple organizations in sales, marketing, and business operations, Plaintiff developed a strong reputation and rapport, and was easily able to navigate and deliver on cross-functional work product that met or exceeded his team's goals while leveraging his relationships to gain concessions that were previously deemed by his own manager as too difficult or unworthy of the time investment required to attain.

22. Just one day before his unlawful termination, Plaintiff had announced to Datadog's entire sales organization that, through the work Plaintiff developed under the event meetings program, Datadog was trending on track for the first time to meet an ambitious target of 40% growth year-over-year in event meetings delivered at a signature event sponsored by Datadog.

23. Just one week after his unlawful termination, in recognition of Plaintiff's performance and potential, Plaintiff was scheduled to participate in a meeting between Buhay and Human Resources to discuss, *inter alia*, what policies, if any, would potentially inhibit Buhay from pursuing a near-term promotion or re-leveling for Plaintiff to the next job level (Director), becoming a people manager, or some combination thereof.

24. Datadog has an "Employee Guide" (commonly referred to as an Employee Handbook) which states, in relevant part:

> "Datadog has the right, with or without notice, <u>in an individual case</u> or generally, <u>to change and/or modify its interpretation of any of its guidelines</u>, policies, practices or working conditions at any time. <u>Nothing in this Guide should be construed as a promise of specific treatment in any specific situation</u> upon which any employee should rely. In addition, many matters covered by this Guide are also described in separate official documents, and such official documents are always controlling over any statement made in this Guide or by any manager." (emphasis added)

> "From time to time, there are situations when a specific policy is broken or egregiously bad behavior is exhibited, including, but not limited to, theft, dishonesty, incompetence, negligence or poor attendance. In these cases, Datadog will see that issues of misconduct are investigated thoroughly and policies are applied in a fair and consistent manner. Disciplinary action may be taken up to and including termination. Datadog is not required to engage in progressive discipline and any attempt at progressive discipline does not imply that your employment is anything other than at will."

## II. <u>The September 19 Human Resources Investigation</u>

25. On September 19, Maddy Barry, Director, People Business Partner held a meeting with Yoerger also attended by Natalie Giuliano, People Generalist. Barry stated she was "asked to look into [Plaintiff]'s understanding of Datadog policies, especially how that interacts or intersects with [Plaintiff]'s spending and travel" with the stated goal of "understand[ing] how [Plaintiff]'s role in these policies…intersect." Barry further stated that she and Giuliano were there to be

"neutral fact finders" and that the conversation was "confidential, to the extent possible and protected from retaliation."

26. Barry asked Plaintiff a series of questions around his travel to Las Vegas and San Francisco. At issue was that Plaintiff booked the travel outside of Datadog's designated travel booking website, instead booking the travel directly, while still paying for the travel using his Corporate Credit Card. Plaintiff explained that he was a new employee and was still acclimating to how policies at the company had worked. Plaintiff confirmed that he understood he had approached the travel bookings incorrectly, explained there were several misunderstandings in the course of the bookings with his manager giving him permission for out-of-policy actions and Plaintiff pointed Barry to inconsistent directions in Datadog policies. Plaintiff further stated had no malicious intent, that Plaintiff did not gain anything from booking outside of the policy, that had had very recently discussed the issues with his manager to learn from the reasonable mistakes a new employee could make, and already agreed with his manager to adhere to the policy moving forward.

27. Despite the stated intent of the call, the questions shifted when Barry asked: "I'm also aware that you have an accommodation with respect to work. Without sharing any medical information, can you share what that accommodation entails?"

28. Barry also asked Plaintiff, "Do you recall sharing that you were suing AWS, about your accommodations, to colleagues?" Plaintiff stated "Yes. That's also public record…"

29. Barry asked Plaintiff: "Do you recall telling Datadog team members at the event that 'you should get anxiety it gives you whatever you want, just tell them you need accommodations, that's how I got my own office.'" Plaintiff denied making the specific statement

and noted he had attempted to bring levity to any discussion of his accommodations due to previous incidents where employees had publicly complained about his accommodations. Plaintiff stated:

> "I'm not just bringing it up out of nowhere…I've had extensive conversations with a number of colleagues who do have accommodations both in the same realm as airfare and that have other accommodations, and I'm intimately familiar with how the ADA works…and have actively encouraged colleagues, not in the casual sense, but to say, mostly from my own experience, if there's things you need to do your job successfully, you should ask for them if they're related to a medical condition or a medical need. So, I certainly advocate for employees to exercise their rights…I've definitely advocated for employees to use accommodations if they need them to perform the essential functions of their role…I am certainly not advocating that anyone commit fraud or lie to the company for the purposes of requesting an accommodation."

30. Plaintiff was also aware that Datadog had recently denied another peer's planned travel because their accommodation made the travel "too expensive." Despite the fact that absent the accommodation, traveling in that instance was a normal and necessary part of the individual's role, and that Plaintiff did not believe "too expensive" was an adequate reason for denying the travel as a corporation with a $50B market capitalization is unlikely to prevail in an argument that more expensive airfare is an undue hardship.

31. Barry also asked Plaintiff if he had stated on another occasion "I hate riding a Peloton, it hurts my taint." Plaintiff admitted that he likely did say this and clarified, based on the context of Human Resources asking about it, that he did not realize it was not a valid anatomical term for the perineum that could be considered as crude or offensive term. Plaintiff further clarified the comment was meant to be explanatory, not inappropriate, and related to his own experience that he sold a Peloton he had purchased after experiencing discomfort while riding.

## III. <u>The October 6 "Final Written Warning"</u>

32. Plaintiff had never received any written warnings or formal reprimands prior to October 6. Nor had Plaintiff received, beyond minor corrections to guide his success in the role, virtually any negative feedback from his management chain.

33. Nevertheless, on October 6, Plaintiff was issued a "Final Written Warning" stating that Plaintiff "violated the Corporate Card and our Travel policies on multiple occasions." That Plaintiff "knowingly violated these policies based on [his] behavior and comments to [his] colleagues regarding [his] spending." That there were "accounts of [Plaintiff] using inappropriate language that falls short of the professional standard expected at Datadog." And that Plaintiff "made comments to colleagues that encouraged them to falsify or exaggerate a disability." Datadog further stated that "*[r]egardless of [Plaintiff's] stated intent*, these remarks were inappropriate, unprofessional, and a breach of our Code of Conduct & Ethics." (emphasis added).

34. The Final Written Warning ends with an expectation that Plaintiff "strictly adhere to all company policies and guidelines, demonstrate honesty and professionalism in all interactions, and refrain from any further inappropriate language or conduct in the workplace" and threatens that "[f]ailure to meet these expectations may result in immediate termination of [Plaintiff's] employment."

35. Plaintiff discussed the warning with his manager, Buhay, after it was issued, during which Buhay shared that: (1) Buhay, nor Plaintiff's skip-level manager, Tania Weidick, Vice President of Marketing, got any advanced warning that Human Resources had decided to issue a "final written warning;" (2) Both Buhay and Weidick did not get any discretion in determining what the outcome of the investigation should be; (3) Buhay disagreed with the decision to issue the letter, the contents of the letter, did not think that level of discipline was necessary for the alleged misconduct; and had not seen other similarly situated employees receive the same

treatment in her nearly ten years of tenure; and (4) stated that Human Resources did not meet with her for any explanation or understanding of the circumstances or context around the alleged violations that would have been exculpatory to Plaintiff.

36. Plaintiff also understood from Buhay that the only "inappropriate language" the warning referenced was the use of the term "taint." Buhay later told Plaintiff she struggled not to laugh when she had to read from the margin comments in the warning script prepared for her by Human Resources and that Buhay had never seen anyone disciplined for a single use of a word, let alone in the context in which Plaintiff used it. Plaintiff, Buhay, and other Datadog employees later often mocked the absurdity of giving a warning for using the word "taint" given profanity and inappropriate language was regularly used by employees at Datadog.

37. Plaintiff also discussed the issuance of the letter with other Directors at the company, all of whom expressed surprise at the way Human Resources handled the issue.

38. Plaintiff also expressed concerns to Buhay that Datadog inquired about protected conduct (*e.g.*, litigation with a prior employer), which Plaintiff deemed to be irrelevant to his current employment and likely unlawful, and that it seemed Datadog was more-less using pretextual excuses of "travel policies" and minor "inappropriate language" against a new employee who would reasonably have a learning curve in adopting to new policies. Plaintiff expressed that it seemed Datadog was intentionally ignoring the context Plaintiff provided to reach a desired end, which Plaintiff deemed as Datadog attempting to punish and deter Plaintiff for engaging in protected conduct and likewise silencing Plaintiff from encouraging others to do the same.

39. Plaintiff expressed fear to Buhay that, as in this case, Human Resources could seemingly decide to terminate Plaintiff and only tell Buhay after the fact, without giving Buhay or Plaintiff's own management chain an opportunity to intervene or exercise discretion. Buhay later

told Plaintiff she raised this issue with Human Resources and also expressed immense frustration with how the situation was handled.

## IV. <u>The October 8 Accommodation Discussion</u>

40. Plaintiff provided documentation to Datadog in July 2025, signed by a psychiatrist licensed to practice in the State of New York, that specifically cites an impairment of "Attention-Deficit/Hyperactivity Disorder; Generalized Anxiety Disorder; [and] Panic Attacks." On July 31, 2025, Plaintiff clarified his accommodation request to be "a dedicated private office space with a closing door." Plaintiff provided the medical documentation for the accommodation both through an electronic accommodation provider used by Datadog called "Disclo" as well as separately to his manager and Josh Fang, Accommodations and Compliance Specialist, over email on July 31, 2025.

41. On August 15, Datadog responded offering the accommodation of "Preferential Booking to ActionDesk (Room 50.01)" and stated "On days you are not in the office, the room needs to be released which will simply require deleting the block for that day via your G-cal."

42. Shortly after Plaintiff began working from "ActionDesk," a small meeting room for four people, he requested the glass to the windows be frosted because other employees, in passing by the meeting room and seeing Plaintiff inside, were making comments about Plaintiff that Plaintiff could hear, such as that Plaintiff was "camped out" in a meeting room, that Plaintiff "got to sit in the meeting room which was unfair," and others pointing to Plaintiff's use of the room and making comments such as "this is why we don't have any places to meet." Datadog subsequently frosted the glass on August 22, 2025.

43. Since August, Plaintiff generally used ActionDesk without issue, releasing it on days he would not be in the office. Because of Plaintiff's daily use of the space, because Plaintiff

had agreed with Datadog when they inquired that Plaintiff would not require an assigned desk, and because ActionDesk was the only space from which Plaintiff actually worked while he was in the office, Plaintiff had setup the space with the same desktop peripherals and property all other employees had at their desks, including a monitor, keyboard, mouse, charging accessories, and cables, with a filing cabinet for Plaintiff's belongings positioned in the corner of the room. Through August and September, multiple meetings by other teams were held in the meeting room when it wasn't in use by Plaintiff without issue.

44. But on October 8, 2025, Fang emailed Plaintiff informing him that "[a]t the end of each day, [Plaintiff must] ensure the room is reset for the next group…includ[ing] removing any personal items, banners, posters, or materials from the room, as well as clearing the whiteboard." Plaintiff objected to this, noting that "[a] dedicated space doesn't necessitate relocating my monitor, desktop peripherals, wiring and accessories on a daily basis." Plaintiff stated explicitly that he considered this to infringe on his right to enjoy equal privileges and benefits as other employees and, specifically cited, *inter alia*, the ADA. Plaintiff leveraged his knowledge of employment law and wrote to Datadog via email, for example, that "it certainly would be a failure to provide a reasonable accommodation if that accommodation did not 'provide the individual with a disability with an equal employment opportunity' which means 'an opportunity to…enjoy the same level of benefits and privileges of employment as are available to the average similarly situated employee without a disability.' Appendix to Part 1630, Title 29. *Cf*. 29 CFR 1630.2(o)(1)(iii)." Plaintiff also explicitly offered to pursue administrative remedies, writing that he was "happy to have counsel cross-file a charge with the NYCCHR and EEOC, and we can litigate this out to see who wins. But that seems like a waste of everyone's time."

45. Despite Plaintiff's objections, including that the unpredictability and daily setup burden aggravated the very conditions the accommodation addressed and effectively deterred use of the accommodation, as of October 15, Kirstie Landers, Senior Manager of HR Compliance, stated Datadog has "confidence in the current accommodation (preferential booking of 50.01, additional privacy modifications, and removal of check-in) in that it continues to meet the documented functional limitations identified by your provider and is reasonable and effective under the ADA." Landers also stated that "[i]f moving or repositioning items within the room creates a barrier to your work or affects the effectiveness of the accommodation, we're happy to review updated documentation from your provider."

## V. <u>The October 20 Human Resources Investigation</u>

46. Plaintiff was again interviewed by Human Resources, this time with Leah Markowitz, People Business Partner, conducting the interview. Despite the stated intent of each investigation being independent and unbiased, Natalie Giuliano, who participated in the first investigation on September 19, was also a participant in this investigation. Markowitz indicated the focus of the conversation was about Plaintiff's relationship with a peer team, the Sponsorship team. Plaintiff recounted recent, normal workplace friction between the teams, which he considered resolved.

47. Markowitz specifically brought up examples of an email thread where Plaintiff removed Jenna Kozlowski, an event marketing manager three job levels below Plaintiff who sits on the sponsorships team, from the email thread while escalating an issue to senior management, as well as an instance where Plaintiff, in the normal course of business, expressed disagreement with a decision Kozlowski made and indicated an intention to escalate the issue to reach an outcome that would be most positive for customers.

48. Markowitz specifically stated "a reason we're here today is because, you know, you said you've worked through things over the past few weeks, but there has been a concern that maybe your tone has shifted since you became aware of a previous HR complaint. Do you feel like from that, your interactions have changed?" Plaintiff answered no.

49. Notably, Plaintiff considered these issues resolved, and not remotely worth the involvement of Human Resources. Plaintiff had already addressed them with his own management and the management of the sponsorships team, in which both also stated they considered the issue resolved and the working relationship to be a non-issue. Nor was the alleged differential treatment remotely materially adverse, unlawful, or beyond what a reasonably prudent person would consider normal communications in the course of business. Plaintiff even sent the entire email chain and all private messages to Human Resources after the meeting to provide full transparency and because he did not remotely consider the conduct inappropriate.

50. Markowitz also asked whether Plaintiff had "vocalized that [he] viewed a Senior Leader's calendar." At Datadog, employee calendars, including those of senior leaders, are public by default and visible to the entire company unless an individual event is affirmatively marked private. Plaintiff's own manager, Buhay, had explained to Plaintiff that open calendars were part of Datadog's culture, and employees at all levels routinely viewed one another's public calendars in the ordinary course of business. No Datadog policy prohibited viewing a public calendar, and Datadog has never identified any such policy to Plaintiff.

51. The event at issue was a meeting, publicly visible on a Vice President's calendar, concerning a colleague, Jess Warm. Plaintiff informed Warm that the event was publicly visible, not to interfere with any process, but so that the sensitive entry could be marked private, as Plaintiff did not consider it his place to raise the oversight himself. Plaintiff concealed nothing about this

interaction and answered Markowitz's questions about it candidly. That Human Resources treated this benign, policy-compliant conduct, alerting a colleague to a privacy oversight on a public calendar, as a subject of investigation further demonstrates that the October 20 investigation was not a good-faith inquiry into misconduct, but a search for pretext to justify a predetermined outcome.

52. Markowitz also inquired as to whether Plaintiff suggested to Warm that Warm should "watch her back" or whether Plaintiff was "making comments about HR or other teams." Markowitz further inquired as to whether Plaintiff stated to Warm that "HR is out to get [Plaintiff]." Plaintiff replied that he "had some apprehension after the previous investigation because [he] disagree[d] with some of the findings and some of the ways that it was [handled]…that there is an adversarial relationship right now." Markowitz followed up by asking "Can you tell me more about what feels adversarial about the relationship?" to which Plaintiff responded "I'm going to limit answering that question only because I have legal counsel who is addressing it."

53. On October 21, Plaintiff met with his manager, Buhay, who again was not informed of the investigation nor given the opportunity to provide context to it. Plaintiff again expressed concern that: (1) employees were seeking remedy through Human Resources in lieu of their own management for what was effectively interpersonal conflict and petty disagreements; (2) that Human Resources was blowing the described behavior out of proportion by describing minor disagreements as effectively being retaliation, despite that Plaintiff had no reporting relationship with the individuals involved, and their own managers didn't consider the issues significant; (3) that Human Resources was effectively acting pretextually to terminate Plaintiff, and it seemed likely Human Resources would make an executive decision, inform Buhay after the fact, and

disregard any exculpatory context or the implications to the business; and (4) that he felt the actions and behavior of Human Resources was unlawful and retaliatory and clearly designed as simply a means to meet their desired end.

54. On October 22, Plaintiff met with Heather Rose, Senior Director of Event Marketing, who oversees the Sponsorship Team. Plaintiff disclosed to Rose the Human Resources complaint, as well as the original complaint, both of which Rose denied any knowledge of. Rose further stated that she considered the conflicts brought up by Human Resources to be resolved, non-issues, and part of normal growing pains of the business. Rose also stated Human Resources had never contacted her about the alleged incidents from either complaint, despite that she was present for both, and that Human Resources seemingly took the word of a single employee as truth without their own, or the target of the investigations, management chain being involved. Rose brought up that she had asked Tania Weidick, who both Buhay (Plaintiff's manager) and she, reported to, to schedule an off-site meeting including Plaintiff to take place in December for the teams to grow and improve their collaboration together, and that Rose was looking forward to Plaintiff's strategy presentation scheduled for the following week.

55. During the October 22 meeting, and subsequently to Buhay, Plaintiff also expressed concern that if all of his feedback or criticism was somehow construed as retaliatory, it effectively chilled his ability to actually hold the team accountable for meeting goals and serving customers, because instead of focusing on actually performing his job, he would have to undergo the immense stress of carefully crafting every word he said. Buhay advised Plaintiff that he should not attend any meetings without a witness, and that he should include her on email communications, but Plaintiff also expressed concern that doing so, itself, could be construed as unnecessary escalation, so Plaintiff felt he was in a lose-lose situation.

56. On October 24, Plaintiff was terminated. The reasoning provided to Plaintiff was that "[a] second investigation was conducted in mid-October regarding your workplace conduct. This investigation confirmed that you engaged in continued inappropriate behavior, not in line with Datadog's code of conduct. So after careful consideration, we have decided to end your employment with Datadog effective today."

57. Datadog did not provide any specific comments, examples, or a description of the alleged "continued inappropriate behavior" to Plaintiff, nor did Datadog provide any part of its determination to Plaintiff in writing.

58. As a result of Datadog's conduct, Plaintiff has and continues to suffer economic harm from lost pay and benefits, as well as non-economic harms. Plaintiff has required treatment by physicians for exacerbation of existing medical conditions, and is suffering from emotional distress, insomnia, panic attacks, mental anguish, embarrassment, humiliation, and reputational harm.

**FIRST CAUSE OF ACTION**
**Disability Discrimination in Violation of**
**N.Y.C. Admin. Code § 8-107(1)(a)**

59. Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

60. It is an "unlawful discriminatory practice" for an employer to "discharge from employment" or to "discriminate…in compensation or in terms, conditions or privileges of employment" "because of the actual or perceived…disability…of any person." N.Y.C. Admin. Code § 8-107(1)(a).

61. To state a claim for discrimination under the NYCHRL, a plaintiff need only allege that he was subjected to unequal treatment—that is, that he was "treated less well" than other

employees—at least in part because of a protected characteristic. *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013); *Hosking v. Memorial Sloan-Kettering Cancer Ctr.*, 186 A.D.3d 58, 62 (1st Dep't 2020).

62. Plaintiff is a member of a protected class as an individual with disabilities within the meaning of the NYCHRL, including Attention-Deficit/Hyperactivity Disorder, Generalized Anxiety Disorder, and Panic Attacks, as documented by a psychiatrist licensed in New York. This readily meets the definition of a "mental or psychological impairment." *See*, *e.g.*, *Fitzgerald v. We Co.*, No. 20 Civ. 5260 (AT), 2022 WL 952963, at *8 (S.D.N.Y. Mar. 30,2022) (noting that "generalized anxiety disorder has been 'recognized as constituting an impairment under the ADA'" (cleaned up)); *Ugactz v. United Parcel Serv., Inc.*, No. 10-CV-1247, 2013 WL 1232355, at *8 (E.D.N.Y. Mar.26, 2013) (holding that "ADHD is a mental impairment that is covered by the ADA").

63. Datadog had actual notice of Plaintiff's disabilities and approved an accommodation consisting of a "dedicated private office space with a closing door."

64. Plaintiff was qualified to hold the position, as demonstrated by Datadog's choice to hire him, his achievements while in the role, and the actions of his management (*e.g.*, actively scheduling career development conversations).

65. Having established so, the question of disability discrimination then turns to whether Plaintiff was adversely or differently treated based on their disability in a way that disadvantaged them and whether the action gives rise to an inference of discrimination. *Hosking*, 186 A.D.3d. . Notably, unlike state and federal law, "[u]nder the City HRL … rather than an adverse action, the plaintiff must show only that the defendant took an action that disadvantaged him or her" *Id*. at 61-62. There is no "severe or pervasive" requirement and the question is whether

the plaintiff was treated less well, at least in part, for a discriminatory reason. *See Mihalik* at 110–13.

66. In October 2025, Datadog materially altered Plaintiff's accommodation to require Plaintiff to dismantle and remove his monitor, peripherals, wiring, and personal effects each evening, despite the accommodation's stated purpose as a "dedicated" workspace.

67. No other employees were required to perform comparable physical labor to "reset" their workspaces each day, and this burden was imposed solely because of Plaintiff's disability and need for an accommodation.

68. Datadog's conduct plainly treated Plaintiff less well than non-disabled employees and was motivated, at least in part, by his disability. Even if Datadog acted for mixed motives, Plaintiff's disability was a motivating factor.

**SECOND CAUSE OF ACTION**
**Failure to Provide a Reasonable Accommodation**
**N.Y.C. Admin. Code § 8-107(15)**

69. Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

70. Plaintiff timely submitted medical documentation requesting a reasonable accommodation, which Datadog initially granted.

71. By later revoking the "dedicated" aspect of the workspace and requiring daily removal of essential equipment, Datadog rendered the accommodation ineffective and nonfunctional.

72. Plaintiff explicitly notified Datadog that this alteration infringed upon his right to equal privileges and benefits and cited the ADA, but Datadog refused to reconsider absent further medical documentation.

73. Where an employee has made a specific request for an accommodation (*e.g.*, a dedicated, private workspace), the employer has a duty to engage in a good faith interactive process with the employee to assess the needs of the employee and the reasonableness of the specific accommodation actually requested by the employee. *Jacobsen v. New York City Health and Hospitals Corp.*,22 N.Y.3d 824, 838 (2014). Simply ignoring the request or insisting on alternatives does not suffice.

74. Under the NYCHRL's uniquely broad and remedial purposes, an employer bears the burden of demonstrating undue hardship as an affirmative defense. N.Y.C. Admin. Code § 8-107(15)(b). Datadog has made no such showing, and is unlikely to do so. As the Supreme Court has recently reminded us, "under any definition, a hardship is more severe than a mere burden," and "'undue' means that the requisite burden, privation, or adversity must rise to an 'excessive' or 'unjustifiable' level." And such a burden must be substantial "in the overall context of an employer's business." *Groff v. DeJoy*, 600 U.S. 447, 143 S. Ct. 2279 (2023). Courts have already likewise found requests for offices are reasonable and don't cause undue hardship, such as in *Murphy v. County of New Hanover*, No. 21-1471 (4th Cir. 2021) (concluding that an enclosed office was a reasonable accommodation); *See also Rivera v. Altranais Home Care LLC* (D. Mass. 2022).

75. By conditioning the accommodation's continuation on unnecessary new documentation and unilaterally degrading a granted accommodation, Datadog violated the NYCHRL.

**<u>THIRD CAUSE OF ACTION</u>**
**Retaliation for Engaging in Protected Activity**
**N.Y.C. Admin. Code § 8-107(7)**

76. Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

77. It is an "unlawful discriminatory practice" to "retaliate or discriminate in any manner against any person because such person has…filed a complaint, testified or assisted in any proceeding under this chapter" or "commenced a civil action alleging the commission of an act which would be an unlawful discriminatory practice under this chapter," or "requested a reasonable accommodation under this chapter." N.Y.C. Admin. Code § 8-107(7).

78. To show a prima facie case of retaliation under the NYCHRL, a plaintiff must show (1) they participated in a protected activity known to the defendant; (2) defendant took an action that disadvantaged them; and (3) a causal connection exists between the protected activity and the adverse action. *Cadet-Legros v. New York Univ. Hosp. Ctr.*, 135 A.D.3d 196, 206 (1st Dep't 2015).

79. In assessing retaliation claims, the courts must apply a "keen sense of workplace realities." *Brightman v. Prison Health Service, Inc.*, 108 AD3d 739, 970 NYS2d 789 (2d Dept 2013); *Williams v. New York City Housing Authority*, 61 AD3d 62, 872 NYS2d 27 (1st Dept 2009). Moreover, consistent with the legislative intent, the concept of "opposing" forbidden practices must be construed broadly and in favor of discrimination plaintiffs to the extent reasonably possible. *Albunio v. New York*, 67 AD3d 407, 889 NYS2d 4 (1st Dept 2009), affd, 16 NY3d 472, 922 NYS2d 244, 947 NE2d 135 (2011). No showing of "material adversity" is required, rather, only that the retaliatory acts complained of were "reasonably likely to deter a person from engaging in protected activity." *Franco v. Hyatt Corporation*, 189 AD3d 569, 137 NYS3d 34 (1st Dept 2020).

80. Plaintiff engaged in multiple forms of protected activity, including: (1) filing a civil cause of action against a previous employer for disability discrimination; (2) requesting and using

a disability accommodation; (3) opposing Datadog's interference with that accommodation; (4) advocating that colleagues exercise their legal right to request accommodations; and (5) warning Datadog that Plaintiff would file a claim regarding their handling of his accommodation request.

81. Datadog undoubtedly knew of Plaintiff's protected activity, as Datadog either directly inquired about it in interviews with Plaintiff, inquired about Plaintiff's conversations with other employees at Datadog relating to protected activity, and Plaintiff explicitly stated to Datadog that Plaintiff was engaging in protected activity.

82. On September 19, 2025, Maddy Barry interrogated Plaintiff about his accommodation, his prior lawsuit against a former employer alleging failure to accommodate and disability discrimination, and his statements encouraging others to seek accommodations. None of which were relevant to the alleged reason for the investigation, nor do Plaintiff's advocacy for other employees and past litigation have any effect or relationship to Plaintiff's current employment at Datadog.

83. Less than three weeks later, Datadog issued a "Final Written Warning" falsely accusing Plaintiff of "encouraging colleagues to falsify or exaggerate a disability." And on October 24, 2025, Datadog terminated Plaintiff's employment for "continued misconduct."

84. In total, the time from Plaintiff's first and only (yet "final") warning, to Plaintiff's termination was only three weeks. Including the initial investigation, makes it a total of five weeks. Temporal proximity between protected activity and a disadvantageous employment actions is sufficient to raise an inference of a causal connection between the two. *Cook v. EmblemHealth Servs. Co.*, LLC, 167 A.D.3d 459, 459–60 (1st Dep't 2018); *Krebaum v. Capital One, N.A.*, 138 A.D.3d 528, 528–29 (1st Dep't 2016) ("The temporal proximity of plaintiff's complaint and the termination of his employment one month later indirectly shows the requisite causal connection.").

85. An employee encouraging others to exercise their statutory rights and making statements about those rights, or, by extension, conduct discussing actions relating thereto, constitute opposition to practices forbidden by the NYCHRL. *See Sorrentino v. Bohbot Entertainment and Media, Inc.*, 265 AD2d 245, 697 NYS2d 263 (1st Dept 1999) (finding that an employee's encouraging a co-employee to bring a sexual harassment claim and making statements concerning the alleged sexual harassment constitute "opposition" to practices forbidden by the Human Rights Law); *See also McGuinness v. Concentric Health Care LLC*, 116 AD3d 527, 984 NYS2d 34 (1st Dept 2014) (triable issue of fact regarding whether plaintiffs letter to human resources director regarding plaintiffs treatment at company and her perceptions of climate at company constituted complaint about age-related bias, a protected activity).

86. Likewise, making a complaint about an employer's failure to implement an accommodation is a protected activity for the purposes of a retaliation claim. *Serdans v. New York and Presbyterian Hosp.*, 112 AD3d 449, 977 NYS2d 196 (1st Dept 2013).

87. The reasons articulated by Datadog for Plaintiff's termination were false and pretextual, are not consistent with how Datadog has handled similarly situated employees, and Datadog's stated justification was a cover for retaliation. Even if Datadog acted for mixed motives, Plaintiff's protected activities were motivating factors.

## FOURTH CAUSE OF ACTION
**Interference with Protected Rights**
**N.Y.C. Admin. Code § 8-107(19)**

88. Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

89. The NYCHRL makes it unlawful "to coerce, intimidate, threaten or interfere with, . . . any person in the exercise or enjoyment of, . . . any right granted or protected" under the statute.

N.Y.C. Admin. Code § 8–107(19). In order to state a claim for interference, a plaintiff must allege "[t]hreats." *Mitura v. Finco Services, Inc. et al*, 23-CV-2879 (VEC), 2024 WL 232323 (S.D.N.Y. Jan. 22, 2024) (quoting *Roelcke v. Zip Aviation, LLC*, No. 15-CV-6284, 2018 WL 1792374, at *9 (S.D.N.Y. Mar. 26, 2018)). A "threat" is the creation of "[a]n impression of impending injury." *Sletten v. LiquidHub, Inc.*, No. 13-CV-1146, 2014 WL 3388866, at *5 (S.D.N.Y. July 11, 2014).

90. The warning issued to Plaintiff by Human Resources was a coercive, intimidating response to Plaintiff's exercise of protected rights, effectively chilling him from discussing accommodations with others or his past pursuit of litigation for violations of the law. The questioning by Human Resources itself functioned as a threat, conveying that invoking or discussing accommodation rights would subject him to Human Resources scrutiny.

91. Because Datadog has no legitimate labor or employee relations reason for knowing about whether Plaintiff is litigating against a former employer, the intention of the warning after the inquiry, after the conversation was stated to be about "travel," was clearly designed to coerce Plaintiff, especially when taken under the context of Plaintiff's manager disagreeing with the disciplinary approach and that the other alleged violations do not amount to violations of policy that would normally be handled in a similar manner.

92. Such conduct independently violates § 8-107(19) of the NYCHRL.

**FIFTH CAUSE OF ACTION**
**Discrimination Under the NYSHRL**

93. Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

94. The New York State Human Rights Law, N.Y. Exec. L. § 296(1)(a) prohibits employers from discriminating against individuals in compensation, terms, conditions, or privileges of employment because of disability.

95. As described herein, Defendant intentionally discriminated against Plaintiff because of his disability in violation of the NYSHRL by:

a. Failing to provide reasonable accommodations despite Plaintiff's requests;

b. Failing to engage in the interactive process in good faith to determine an effective accommodation;

c. Imposing working conditions inconsistent with Plaintiff's medical restrictions; and

d. Subjecting Plaintiff to adverse employment actions, including termination, because of his disability and/or his requests for accommodation.

96. Defendant's conduct was willful and in reckless disregard of Plaintiff's rights under the NYSHRL.

97. As a direct and proximate result of Defendant's unlawful discriminatory conduct, Plaintiff has suffered and continues to suffer economic loss and severe emotional distress, for which he is entitled to an award of compensatory and punitive damages.

98. Plaintiff is entitled to declaratory relief, compensatory damages, punitive damages, attorneys' fees and costs, and all other relief available under the NYSHRL.

**SIXTH CAUSE OF ACTION**
**Retaliation Under the NYSHRL**

99. Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

100. The New York State Human Rights Law, N.Y. Exec. L. § 296(7), prohibits employers from retaliating against employees who oppose practices forbidden by the NYSHRL.

101. Plaintiff engaged in protected activity under the ADA, including but not limited to:

i. Requesting reasonable accommodation for his disability;

ii. Raising concerns about Defendant's failure to comply with the ADA and interactive process obligations; and

iii. Opposing Defendant's discriminatory practices and treatment related to disability.

102. In response to Plaintiff's protected activity, Defendant retaliated against Plaintiff by subjecting him to materially adverse actions, including:

i. Failing to provide his reasonable and necessary accommodation; and

ii. Unlawfully terminating him.

103. As a direct and proximate result of Defendant's unlawful retaliatory conduct, Plaintiff has suffered and continues to suffer economic loss and severe emotional distress, for which he is entitled to an award of damages.

104. Plaintiff is entitled to declaratory relief, compensatory damages, punitive damages, attorneys' fees and costs, and all other relief available under the NYSHRL.

**SEVENTH CAUSE OF ACTION**
**Discrimination Under the ADA**

105. Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

106. Plaintiff has a disability, as defined in 42 U.S.C. § 12102(1), in that he has physical and/or mental impairments that substantially limit one or more major life activities, and/or was regarded by Defendant as having such an impairment.

107. At all times relevant, Plaintiff was an "employee" within the meaning of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12111(4), and Defendant was an "employer" within the meaning of 42 U.S.C. § 12111(5). Plaintiff is a qualified individual with a disability.

108. Plaintiff was qualified to perform the essential functions of his position with or without reasonable accommodation.

109. Defendant engaged in unlawful employment practices in violation of 42 U.S.C. § 12112 by:

a. Failing to provide reasonable accommodations despite Plaintiff's requests;

b. Failing to engage in the interactive process in good faith to determine an effective accommodation;

c. Imposing working conditions inconsistent with Plaintiff's medical restrictions; and

d. Subjecting Plaintiff to adverse employment actions, including termination, because of his disability and/or his requests for accommodation.

110. Under the ADA, a plaintiff alleging employment discrimination must show that disability was the but-for cause of the adverse employment action, meaning the action would not have occurred absent the disability-related conduct. *See Natofsky v. City of New York*, 921 F.3d 337, 348 (2d Cir. 2019). Plaintiff meets that standard here.

111. Defendant's own contemporaneous documentation forecloses any non-discriminatory explanation: the October 6 Final Written Warning did not merely mention Plaintiff's accommodation-related speech in passing, it expressly identified "comments to colleagues that encouraged them to falsify or exaggerate a disability" as a basis for discipline, the first formal discipline of Plaintiff's employment, imposed seventeen days after Human Resources' September 19th interrogation of Plaintiff about his disability accommodation, his prior disability-discrimination litigation, and his encouragement of colleagues to seek accommodations. This nexus between protected, disability-linked conduct and Defendant's adverse action is not

circumstantial inference. It is Defendant's own stated rationale, and it establishes that Plaintiff would not have been disciplined but for that conduct.

112. The temporal proximity between Plaintiff's October 8 written invocation of his ADA rights, in which he expressly cited the ADA's implementing regulations and referenced potential administrative charges, and Defendant's October 20 opening of a second Human Resources investigation, followed by his termination eighteen days later, further supports that Plaintiff's disability-related advocacy was the but-for cause of his termination. Absent Plaintiff's disability, his accommodation request, and his protected advocacy on behalf of himself and similarly situated colleagues, Defendant lacked any independent, non-pretextual basis to terminate an employee who, one day before the adverse-action sequence began, had been publicly recognized for record-setting performance, and who, one week after his termination, had been scheduled for a promotion discussion.

113. Plaintiff was therefore unlawfully discharged in direct violation of the ADA. Plaintiff’s Disability status accordingly was the but-for causation necessary to prove his claim.

**EIGHTH CAUSE OF ACTION**
**Retaliation Under the ADA**

114. Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

115. At all times relevant, Plaintiff was an “employee” within the meaning of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12111(4), and Defendant was an “employer” within the meaning of 42 U.S.C. § 12111(5).

116. Under 42 U.S.C. § 12203, it is unlawful for an employer to retaliate against an employee because he has opposed acts made unlawful under the ADA or because he made a

charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the ADA.

117. Plaintiff engaged in protected activity under the ADA, including but not limited to:

i. Requesting reasonable accommodation for his disability;

ii. Raising concerns about Defendant's failure to comply with the ADA and interactive process obligations; and

iii. Opposing Defendant's discriminatory practices and treatment related to disability.

118. In response to Plaintiff's protected activity, Defendant retaliated against Plaintiff by subjecting him to materially adverse actions, including:

i. Failing to provide his reasonable and necessary accommodation; and

ii. Unlawfully terminating him.

119. Defendant's retaliatory conduct was intentional and materially adverse, and it would dissuade a reasonable employee from engaging in protected activity under the ADA.

120. As a direct and proximate result of Defendant's unlawful retaliation, Plaintiff has suffered lost wages, lost employment benefits, emotional distress, reputational harm, and other damages in an amount to be proven at trial.

121. Defendant's conduct was willful and/or carried out with reckless disregard of Plaintiff's federally protected rights, entitling him to compensatory and punitive damages pursuant to 42 U.S.C. § 1981a.

122. Plaintiff seeks all remedies available under 42 U.S.C. § 12203 and related statutes, including back pay, reinstatement or front pay, compensatory and punitive damages, attorney's fees, and costs.

**NINTH CAUSE OF ACTION**

Retaliation Under N.Y. Labor Law § 740

123. Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

124. N.Y. Labor Law § 740 prohibits an employer from taking retaliatory action against an employee because the employee discloses or threatens to disclose to a supervisor or public body an activity, policy, or practice of the employer that the employee reasonably believes violates a law, rule, or regulation, or because the employee objects to or refuses to participate in such activity, policy, or practice. N.Y. Lab. Law § 740(2)(a), (c). An employee need not prove an actual violation of law, only a reasonable belief that one occurred.

125. Plaintiff engaged in protected activity under § 740(2) when, on October 8, 2025, he objected in writing to Datadog's Accommodations and Compliance Specialist and its Senior Manager of HR Compliance that Datadog's unilateral degradation of his approved accommodation violated the ADA, citing 29 C.F.R. § 1630.2(o)(1)(iii) and its interpretive appendix, and stated that he was prepared to have counsel cross-file charges with the EEOC and the New York City Commission on Human Rights.

126. Plaintiff engaged in further protected activity on October 21, 2025, when he told his supervisor, Kimberly Buhay, that Human Resources' conduct toward him was "unlawful and retaliatory," constituting an objection to a practice Plaintiff reasonably believed violated law, communicated directly to a supervisor as defined by the statute.

127. Datadog was aware of this protected activity through its Accommodations and Compliance Specialist, its Senior Manager of HR Compliance, and Plaintiff's direct supervisor.

128. On October 24, 2025, three days after Plaintiff's statement to Buhay and sixteen days after his written ADA objection, Datadog terminated Plaintiff's employment, citing only

vague and unspecified "continued inappropriate behavior" that Datadog has never identified in writing or otherwise.

129. This retaliatory action was taken because of, and in close temporal proximity to, Plaintiff's protected activity under § 740(2). Datadog's stated justification is pretextual and unsupported by any specific, articulated conduct.

130. Datadog's conduct was willful, malicious, or wanton, entitling Plaintiff to punitive damages under N.Y. Lab. Law § 740(5)(g), in addition to back pay, front pay, compensatory damages for emotional distress, a civil penalty, and reasonable attorneys' fees and costs.

131. Plaintiff demands a trial by jury on this cause of action pursuant to N.Y. Lab. Law § 740(4)(b).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff is entitled to and prays for the following relief:

A. A declaratory judgment that the actions, conduct and practices of Defendant complained of herein violate the law;

B. An award of damages against Defendant, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages, including, but not limited to, loss of past and future income, wages, compensation, equity and other benefits of employment;

C. An award of damages against Defendant, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for his mental anguish and emotional distress, embarrassment, as well as damage to his reputation, under applicable law;

D. An award of punitive damages and any applicable penalties in an amount to be determined at trial;

E. Prejudgment interest on all amounts due;

F. An award of fees and costs that Plaintiff has incurred in this action, including, but not limited to, expert witness fees, as well Plaintiff's reasonable attorneys' fees and costs to the fullest extent permitted by law; and

G. Such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: August 27, 2026
Bellport, New York

Respectfully Submitted,

**MESIDOR PLLC**

By: ______________________

Marjorie Mesidor
30 Station Road, Suite 5
Bellport, New York 11713
(212) 930-6010
mm@marjoriemesidor.com

*Counsel for Plaintiff*